## SWANSON *v.* KIRBY *et al.*

1. Under the system of pleading which prevails in this State, an action may be brought against one who has sold out a given business and contracted not to again carry on the same in a particular locality, both to recover such damages as may have accrued to the plaintiff from a breach of the contract up to the bringing of the action, and to restrain the defendant from a further violation of his agreement.

2. Where such an agreement though unlimited as to time, is limited as to place and is in this and in other respects reasonable and proper, it is valid and also assignable; and the assignee may maintain such an action against the party violating his covenant not to engage in the business in question in the locality designated.

3. Under the evidence submitted, there was no abuse of discretion in granting the injunction prayed for in the present case.

June 18, 1896. By two Justices. Argued at the last term.

Injunction. Before Judge Lumpkin. Fulton county. January 4, 1896.

The following contract was executed:

"Atlanta, Ga., October 1st, 1894.   For and in consideration of the sum of $1,500 I hereby sell and convey to E. E. Kirby my membership No. 19 in the American Ticket Brokers Association; also my fire and burglar-proof safe, desk, typewriter, and all other office fixtures contained in my office at 30 Wall street, this city. I guarantee the above to be free from all incumbrance.   I also agree not to open a ticket office in the city of Atlanta without the consent of the said E. E. Kirby.                    J. M. Swanson."

In the same month Kirby executed upon this contract a transfer to E. S. Pratt, in consideration of $2,000, of the membership and personal property therein conveyed to him by Swanson.   On August 24, 1895, Pratt executed to W. W. Moore, in consideration of $1,000, all his right and title to said property, and on September 2, 1895, Moore executed to Kirby, in consideration of $500, half of all his right, title and interest in the within contract, except the membership in the American Ticket Brokers Association and the personal property therein enumerated.

On October 11, 1895, Kirby and Moore brought their petition against Swanson, for injunction to prevent him from keeping open a ticket office and conducting a ticket brokerage business in the city of Atlanta.   On the hearing the injunction was granted.   The petition, which was positively sworn to by both plaintiffs, alleges that membership No. 19 in said association was a valuable right, franchise and property; that for a long time up to October 1, 1894, Swanson had been conducting a ticket broker's business in Atlanta; that one of the inducements which led Kirby to buy from him the membership in the ticket brokers association and to pay $1,500 therefor was his agreement not to re-open a ticket office in Atlanta without Kirby's consent; that Swanson, in disregard of his agreement, has opened and is now keeping open a ticket office and conducting the business of a ticket broker in Atlanta, and but for his agree-

ment not to do so Kirby would not have made the purchase shown by the contract; that Kirby was engaged in the business of a ticket broker in Atlanta when he bought out Swanson, and is still so engaged; that petitioners are irreparably damaged, by reason of the difficulty in proving the damage they will sustain, if Swanson is permitted to keep open his office and conduct a ticket brokerage business in Atlanta, and, besides, he is insolvent; that he is now actively engaged in the business, competing with petitioners in said business, and doing all he can to take from them their business and customers; that they have been damaged $1,000 by said violation of the agreement; that Swanson holds license from the city to conduct said business, and if he is allowed to carry on the same under said license or to transfer the license and good will of the business to a third party, petitioners will suffer irreparable damage. They waive discovery, and pray for injunction; that they may recover from Swanson all damage which they have sustained and may sustain by reason of the breach of said agreement; and for general relief. At the hearing they were allowed to amend the allegations and prayer for damages by alleging, that they had been damaged $1,000 to this date; and by praying to recover all damage which they have sustained to the time of filing the petition; and by striking the prayer for damage which they may sustain.

No answer by defendant appears to have been filed, but at the hearing there was testimony by himself, S. L. Harris and Alexander Stewart, in substance as follows: It is true he sold out his business to Kirby on October 1, 1894, as ticket broker in Atlanta, with the office furniture, and Kirby went in business in his former office and undertook and agreed with him to pay the rent of $50 per month for the place, for which Swanson was liable under a lease till October 1, 1895, the landlord having refused to release him therefrom. Kirby kept the office till about June 30, 1895, carrying on the business therein,

but then abandoned the business, went away from Atlanta, closed the office, and removed everything therefrom, left nothing out of which the rent could be made, and then entirely abandoned the ticket business in Atlanta. About that time Kirby told him he had to quit the business, had lost all he had therein, and had not a dollar with which to pay the rent. He then tried to get Swanson to go back into the ticket business with him in Atlanta, which Swanson refused to do. He begged Swanson to assist him in getting back into the business in Atlanta. He knew full well that Swanson was contemplating re-entering the business in Atlanta, but made no objection thereto. They talked over the matter a number of times. Kirby knew Swanson was contemplating going back into the business, and under these circumstances begged him to go back with him and take a half-interest in the business. Kirby was willing for him, if he would go in with him, to employ a clerk and put in the office, and allow Swanson to run another and separate office of his own, so as not to interfere with Swanson giving his whole time to his own office. He finally went with Kirby to the landlord to see what arrangement could be made about renting an office for Kirby with a view of going in business with him, but no arrangement was made and he dropped the negotiations. Afterwards he did make an arrangement with the landlord, whereby Kirby was enabled to get an office and go back into business, and but for this assistance Kirby could never have gotten back into business. During all this time and throughout all these negotiations, Kirby, well knowing that Swanson was thinking of going back into the business as ticket broker, never interposed a single objection thereto, but made every effort to get Swanson to go back into business with him. It was long after Kirby told him he had lost all he had in the business, was disgusted with it, had abandoned it, that Swanson ever thought of re-entering, and he did not hear of Kirby ever making any objection to his going

back into the business. Although Swanson was really expecting to go back into busineess, in fact he never did do so, and was not in the business on his own account at the time of the filing of the injunction against him, and has never been in the business as a ticket broker since the first of October, 1894. Harris, his brother-in-law, who had been in the business with him for a long time prior to that date, and who knew all about the ticket business, in April, 1895, rented the office now sought to be enjoined, opened business on his own account and responsibility, and asked him to let him do business under the name of Swanson's ticket office, as Swanson had for a long time been in the ticket business and was well known to the traveling public. He had no connection with said office at any time, except as a clerk for Harris. Harris took out the license in his name without his knowledge and consent, and as soon as he discovered this, he had Harris to go and have the license changed. Harris employed him to work on a salary, and this was all the connection he had with the business. The same is not operated, owned or controlled by Swanson or for his benefit directly or indirectly in any way whatever. He is perfectly solvent. It is true that he sent out a circular announcing that he intended going back into business, but changed his mind and never did so. He denies making the statements to Kirby and Moore hereafter referred to in their testimony. He did not get out the office stationery or have anything to do with it. Harris did all this before hiring him. The office was opened by Harris on September 1, 1895, but he did not go in there until September 15. He had nothing to do with the office except as a clerk at $100 a month. A clerk in a ticket broker's office is entitled to become a member of the ticket brokers association. The transfer of a membership in the American Ticket Brokers Association is not valid unless approved and accepted by the executive committee thereof. Harris testified, that he learned the ticket business under

Swanson before October, 1894. Swanson had done business several years under the sign "Swanson's Cut Rate Ticket Office"; and when he opened the office he put out the same style sign, as the name Swanson was well known to the traveling public, and he considered it worth something. He is the owner of the office sought to be enjoined, and of the stock and fixtures therein, and was at the time this suit was filed, and Swanson had no interest in the profits or losses of the business, but was employed on a salary as a clerk.

The evidence for the plaintiffs tends strongly to support the allegations of the petition, and to show the following: The office where Swanson is doing business is adjacent to the one he occupied when he sold out to Kirby, and bears the next number on the same street. Everything connected with the office where Swanson opened on September 1, 1895, indicates that the business is his and was conducted by him from that date until the petition was filed. He was actively engaged in conducting it. The place was and still is known as Swanson's Cut Rate Ticket Office; those words being upon the signs over and at the sides of the door. The same or similar signs were so placed on the former office which Swanson sold to Kirby. The business cards which have been and still are being used at the new place occupied by Swanson, and all the literature and printed matter used in advertising the same, are in Swanson's name. They state, among other things, that the business was established in 1888. Nowhere does the name of Harris appear on the cards, literature or signs or in any of the advertisements. About September 20, 1895, Swanson stated to Moore that business was very good, but he had heard the railroads would make all tickets iron-clad, and in that event he did not expect to make more than $6,000 out of said business during the exposition. The business referred to in this conversation was that conducted by Swanson next to the place where Moore and Kirby were

so engaged. Kirby did not abandon the office and go out of business on July 1, 1895, as claimed by defendant. He did go to LaGrange on account of sickness in his family, and was there delayed and did not return until July 3d. While so absent Moore, without Kirby's knowledge or consent, temporarily closed the office. They dissolved their partnership about August 15th, at the request of Kirby, who desired to accept a proposition from the landlord referred to. He did not tell Swanson he had quit the business, but informed him that he intended to continue therein until after the exposition. He did not try to get Swanson to go back into the business with him in Atlanta. Swanson proposed that they do so, but their negotiations failed and terms could not be agreed on. It is not true that he begged Swanson to assist him to get back into business, nor did he know that Swanson was contemplating going back except from negotiations looking to their going in together. It is true that pending such negotiations of forming a partnership, Swanson stated that he could not give his entire time to the business, and proposed to put in a clerk and run a separate office of his own; but this was not agreed to. Kirby made no objection to Swanson going into business as a partner with him, but never gave consent for him to enter on his own account. Swanson belonged to the Atlanta Local Ticket Brokers Association, of which Kirby is secretary, and of which no one can be a member except a ticket broker engaged in the business in Atlanta, was present at its meetings, paid his dues, etc. Kirby told Swanson, about September 20, 1895, that he violated his agreement to keep out of business. Kirby has not consented to his running a business in Atlanta, and has not himself quit business. He had license to conduct the same from July 1, 1895, to July 1, 1896. Shortly before the time Swanson opened, he told Kirby he was going to furnish the money for an office and was to get two thirds of the

profits and would not take $4,000 for his profits in the business.

The assignments of error allege, that the evidence did not warrant the injunction; that the petition prayed for injunction and damages at the same time; that the court erred in allowing the amendment; that a joint action cannot be maintained by the plaintiffs; and that the contract in this case could not be assigned.

*Hall & Hammond* and *L. P. Skeen*, for plaintiff in error.   *Hines & Hale*, contra.

Lumpkin, Justice.

The principal complaint in the present bill of exceptions is that the trial judge erred in granting an injunction.   It alleges, among other things, that so doing was error, (1) "because the petition prayed for injunction and damages at the same time," and (2) because the evidence did not warrant the injunction.   The nature of the case will be gathered from the official report.

1. We do not see why a prayer for the recovery of damages should affect the question of granting an injunction in a given case.   Indeed, under the system of pleading which prevails in this State, no good reason occurs to us why a plaintiff may not recover damages which at the time of the bringing of his action had already accrued to him from a breach of the defendant's contract, and at the same time restrain the defendant from a further violation of the contract, if the facts are such as to entitle the plaintiff to relief of this nature.

2, 3. "Contracts in total restraint of trade are void; but where the restraint is partial, reasonable and founded upon a good consideration, it is valid, and will be enforced."   3 Am. & Eng. Enc. of Law, 882.   In support of this text a very large number of cases are cited in the notes on pages 882-885.   An examination of them will throw a flood of light upon  the law relating to contracts in restraint of

trade. The proper conclusions deducible from them, so far as applicable to the case in hand, are, we think, correctly stated in the second head-note. For the proposition that such agreements are assignable, see: Elves *v.* Crofts, 10 C. B. 239; Hedge, Elliott & Co. *v.* Lowe, 47 Iowa, 137; Gompers *et al. v.* Rochester, 56 Pa. St. 194; Guerand *v.* Dandelet, 32 Md. 561; California Steam Navigation Co. *v.* Wright, 6 Cal. 258. *Judgment affirmed.*